May it please the Court, Quentin Cedar on behalf of the appellants Esparza Enterprises and Luis M. Esparza. Let me begin by explaining the context of the case because I think it's crucial to understanding why the endorsement Burlington claims or attempts to use to deny coverage is unenforceable. This case is about an insurance company selling an insurance policy to a labor contractor and then in a very convoluted, complex way finding a way to exclude coverage that the labor contractor expects regarding probably the greatest exposure that a labor contractor faces. Can I ask you one quick question? Sure. It's not clear to me. Was the contract purchased through a broker or was there direct dealings with the insurance company? It was purchased through direct dealings with the insurance company, I believe. So it was just the insured and the insurance company and there was no intervening? That is my understanding. Okay. And that raises the question I've had as well, which is that your argument is really saying, well, it's the insurance company that has the burden of figuring out what insurance coverage your client needs. Why is that the case? Well, because the insurance company, case law generally says that if an insurer is expecting a certain kind of coverage, the insurance company That's begging the question. I mean, if I go and buy a home insurance policy and get into a car wreck and I say, well, gee, I thought this policy covered everything, is my expectation that I thought it covered my car as well, something that imposes a burden on the insurance company to make sure that I haven't purchased the wrong kind of insurance? And that's why the context of this case is so important. And that's what distinguishes this case from the example that you gave is that in this case we're dealing with a labor contract. This isn't workers' comp coverage, is it? Correct. And it's so why is it the fact that your client's business happens to be supplying farm labor is something the insurance company is supposed to figure out what kind of coverage your client should buy? Well, the insurance company knows we're a farm labor contractor. Does it know that your client is voluntarily entering into agreements to indemnify the people that you contract with yourself? That's really the nub of the problem, isn't it? Because your client has taken on responsibility that otherwise your client wouldn't have had. The exception doesn't extend to liability your client would have had under ordinary tort principles. You've taken on this indemnification responsibility. And now you're telling the insurance carrier you're taking on this responsibility. But that's not what a general liability policy customarily does. General liability policies do cover indemnification agreements. As a broad principle. So I've got a – I happen to have a personal umbrella policy. I go out and sign an indemnification telling all my friends, tell you what, I'll cover you for anything you get into. And my carrier's liable for that? Yeah. I think, again, the distinction is here we're dealing with a labor contractor. A labor contractor – Which brings me back to the question. Why is it it's the insurance company's obligation to figure out what your client's particular needs are? If it's in an area where the insured is expecting coverage, the insurance company has an obligation to make clear, conspicuous, and draw the insured's attention to the fact that, look, you're expecting this kind of coverage? Wait, wait. Again, you're back to expectation. But I'm saying why should anybody expect to be responsible for indemnification agreements that you voluntarily entered into that impose liability upon you beyond what ordinary tort principles would impose? Because covering indemnity agreements is part of the standard GL policy form. In this case, we're dealing with a labor contractor. The nature of labor contractors' business is they virtually always – It's not inherent in the business. Well, that's how the business is operated, but it's not inherent in it. You could be a labor contractor without indemnifying, in this case, the farmer for everything that happens on the farm. But in that case, you would be an out-of-business labor contractor because it is just a nature of business. So did your client notify the insurer that it was entering into all these agreements that assumed on your client liability that your client wouldn't have under tort law? I think that's the understanding when the insured knows that we're a labor contractor. Is this kind of indemnification common in where a labor contractor supplies employees to farms? Is this the norm? That is the standard. That is the norm. I mean, would it be common knowledge that this is the standard? Yes. And how do we know this from the record? I believe we cite to that in our brief in the separate statement. So, you know, basically, normally what happens when a labor contractor's employee is injured and files a claim is that it's going to be covered by workers' compensation. However, as a normal business condition, labor contractors must agree to indemnify whoever retained their services. The workers' comp won't cover that indemnity claim against the labor contractor. In that circumstance, the standard GL policy is going to have coverage. So that's, as I understand it, that's the general way around the workman's comp exemption. That is, the employer can't be sued. So they sue the next person down the line, and the next person down the line then seeks indemnification against the employer, and that's how the employer gets stuck, notwithstanding workman's compensation. But it doesn't prevent the workman's compensation action from taking place as well. And I assume that's what happened here, that there was work comp coverage. I take it your client did have workers' compensation coverage. I believe so. Well, you went to a verdict. In the underlying action. Was it a bench trial? It was a bench trial. Wasn't there a claim of lien by the workers' compensation carrier? I agree with the man. And didn't that lien get taken care of? I can't say we didn't handle the underlying action, Your Honor. So when the general liability insurer attempts to remove that coverage for indemnity agreements covering the injuries to the insured's employee, it allows for a huge kind of expansion. You've given us this broad statement that the general liability policy usually covers indemnification. I'm not sure what that's based on. Can you? I mean, there is an exclusion in the general policy. The argument here, as I understand it, is that the exclusion was confusing. But what I understood was that the policy did not cover an indemnification agreement that extended the insured's liability beyond what general tort liability principles would impose. Actually, the employment liability exclusion that we're talking about in the standard policy form, the 16 pages. I'm actually talking about right now the contractual liability form. That's the source. My concern is if your client indemnifies somebody else, which is what's happened here, why is it the insurance carrier should assume responsibility for that if your client has broadened his liability by entering into these indemnification agreements? First, because that's what the standard policy says. I don't think so. Point to something that tells me that's what the general policy says. Okay. And on the contractual liability form, it provides coverage for insured contracts. Insured contracts are defined as indemnity agreements or would include that. If you're looking at some part of the particular policy, please point me to it. Right. ER-260. Okay. There is an exception to insured contracts. There's an exception to the exclusion for because of insured contracts. But insured contracts are defined in the endorsement as excluding an occurrence caused by the sole negligence of said person or organizations. Now, in the underlying action, the only defendant was Vignolo, right? Is that correct? I'm sorry. Could you say that again? The only defendant in the underlying action was Vignolo. And they had a cross complaint for indemnity. The only defendant, defendant, right, in the underlying action was Vignolo, correct? Correct. No. There were 10 does. Was there any attempt to make another person similarly liable so they wouldn't be caused by the sole negligence of said person or organization? In the underlying action? I don't think so. So if the underlying action only involved Vignolo, why doesn't the exclusion apply? Well, getting back to the question that I was asked previously, the contractual liability agreement, you had mentioned the endorsement adds a subsection 4 after 15 paragraphs of repeating the same insured contract definition that excludes indemnity agreements based on the sole negligence of the indemnity. The original policy did not contain that additional point. So all indemnity agreements were covered. Excluded. Or accepted. Excluded from an exclusion. Accepted from the exclusion. No. That's not what 260 says. 260 is exclusions. This insurance does not apply to damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contractor agreement. And then there's an exception to the exclusion. But the basic principle is that, and the exception takes back, says there is coverage if your client is going to be liable otherwise. But the basic principle is that if your client enters into agreements to indemnify somebody else, the insurance carrier is not responsible for that. Under the contractual liability exclusion, it says, this exclusion does not apply to liability for damages assumed in a contractor agreement that is an insured contract. That is deleted by the endorsement. And so then the endorsement goes through. So that's back to my original point of this complex gymnastics, convoluted way that the insurance company is going about doing this, not bringing it to the insured's attention. This endorsement was part of the original policy. It wasn't a subsequent add-on. This endorsement was part of the original policy. So essentially they gave you 14 or 15 pages earlier coverage, and then 15 or 16 pages later they take it back. It's a 68-page policy. Sixteen pages were the basic coverage provisions. And then there were 40 pages of mandatory endorsements. So in regards to the contractual ---- Is there anything in the record as to why they write the policy this way, sort of a strange way to write a contract? And they should be obligated to write it in such a manner that where the coverage is expected by the insured, that it draws the insured's attention. You have to get involved in what was expected by the insured. You just said that the first part of the policy they grant you the coverage, and then 16 pages later, among a whole collection of exclusions, they take back what they gave you earlier. Why do you have to base a claim on expectations from a prior insurance policy, which is hard to pin on the defendant? The nature of the business of a labor contractor makes it clear that the labor contractor has a huge gap where workers' compensation doesn't apply to these indemnity agreements arising out of injuries to their employee. The previous policy, if you look at it, does it in a clear manner. It has an employee liability endorsement that affects the employee liability exclusion. In this case, the contractual liability endorsement affects the employee liability exclusion. In the previous insurance policy, it has an amendment to the insured contract definition. That affects the insured contract definition. In this case, there's a contractual liability endorsement that affects an insured contract definition. So it doesn't draw the insured's attention to these provisions the way the previous policy had done. How big an operation is Aspara Enterprises? That I could not represent here. Mr. Cedar, we're in California. We have to follow California rules of interpretation of an insurance contract. Bank of the West tells us that we should first take a look at the plain meaning before we get to the expectations of the insured. If there's no ambiguity in the plain meaning, why do we have to go to the expectations of the insured? I think in this case, sure, you can read one word from the policy. You could read one phrase from the policy and say, look, this might be clear. But in the broad context overall, whether or not these endorsements were conspicuous and brought the insured's attention, I think that's the issue. And because of how they don't relate to the endorsements that we've been discussing, the employee liability endorsement, it doesn't relate to the insured contract definition, as the previous policy had done. I think that does introduce ambiguity and makes it inconspicuous. Is the determination of whether it's conspicuous or not a factual question for the district court, or is it a legal question that we review de novo? I believe it's a legal question reviewed de novo. Thank you. Could I ask you one question about the auto exclusion, which is entirely separate from the argument that you've been making? Why doesn't that take care of this? Why do we even have to reach any of the other arguments that you're making? Right. I think what makes the auto exclusion not apply is the fact that in addition to the allegations that the grapes were being loaded onto the back of the truck, the plaintiffs in the underlying action also alleged that there was a failure to take certain precautions, certain safety precautions, communications, equipment, and that they didn't have that equipment in place that would have been necessary to provide proper and adequate medical emergency care. And the clause says the bodily insurance does not apply to bodily injury or property arising out of any auto, the loading or unloading of any aircraft, auto, or watercraft. That's pretty broad language. He was unloading or loading, I can't remember now exactly, on an automobile or a truck. And I believe you're reading from the exclusion, but there's also an endorsement to that exclusion as well. But in terms of answering that question, the concurrent What does the endorsement to the exclusion say? It just says, I believe it just generally says arising out of any auto, which is an overly broad exclusion to be interpreted in this case. But then the point that I want to make is that the concurrent proximate cause doctrine provides that when there's an excluded cause and a cause that's not excluded, that coverage should apply. And in this case, because there were these alleged failures to take these adequate precautions, that coverage should not be excluded and should apply. And just, if I may just, Burlington argues that, well, these causes are inextricably linked, and they cite to the Salas case in support of that argument. In Salas, it involved a maintenance exclusion in an auto clause where a person put a flammable gas to fill up the tire, and the person was fixing the rim to fix the leak. The tire exploded. In an attempt to argue for coverage, the insured said, well, there was a failure to warn on my part about the flammable gas. And so the actual welding and the use of the sealant in the tire was excluded under the auto exclusion and the policy under the maintenance portion of that exclusion. The difference between that in this case is that in that case, without the use of the flammable gas, there could be no failure to warn. In this case, the alleged failure to take adequate precautions is not dependent on the auto or the loading or unloading of that auto. And so with that, I will. Roberts. Thank you. We'll hear from Burlington. Your Honor, if I just may request a little additional time for rebuttal because I did spend. You're well over time. We'll see if rebuttal is necessary. Thank you, Your Honor. Good morning. Aaron Agnes for the Burlington Insurance Company. To address some of the questions that were just asked, yes, there was a workers' comp claim. Yes, workers' comp benefits got paid. No, the insured did not negotiate a policy directly with the insurance company. If you look on excerpts of Record 245, you'll see the name of Burlington's agent, at least, which was Liston Glennon. The insured had its own broker as well. I deposed them in this case. Unfortunately, the name is slipping my mind, but I actually thought that that is who would be brought into this suit. I don't think that's altogether insignificant, that the insured was at least being advised by someone who was familiar with insurance contracts. But what troubles me is why do you write in a policy like this? I mean, it just almost looks like you're trying to deliberately confuse people. I would respect that. What's the justification for saying here you have coverage and then 16 pages later you don't have coverage? Why don't you just say it once, all in one place? And, you know, the endorsements, there's often a lot of endorsements. I just finished a jury trial before Judge Carter in the Central District. The policy was 274 pages. Well, so what? I mean, you know, you're talking about whether it's conspicuous or not. Right. And what the policy tries to do? I'm just trying to – again, it's not irrelevant to me that the insured had his own broker, so he was dealing with someone who was capable of looking after his rights. But looking at this policy, I mean, an ordinary insured doesn't go through this like a lawyer does. I mean, and then you – it seems to be worded in a way that you're trying to trick somebody. Well, I think what – I'd sort of like to know why. Why is it worded this way? Well, I don't know why the insurance company – I mean, the forms are approved by the state. I don't know what goes into the actual creation of an insurance policy itself, but everything gets vetted. And I think that the key here, which really separates many of the cases that are cited on conspicuousness, is if you look at the very beginning of the policy, and I think it's pretty standard now, although back in the day they didn't always do it this way, there's a listing of forms, and it tells you all the forms. It's like a table of contents, and it also gives you the title. And so what we're hearing right now is that contractual liability is of paramount concern to the farm laborer, especially this one. Well, on page two of the policy, or three of the policy, which is excerpts of record 243, it says the form number, and it says contractual liability amendment. It all seems to me to be unrealistic if you're dealing with ordinary people looking at a contract, and you have this exclusion B at the beginning. It's just you virtually have to take three days to go over this with a microscope or looking glass. And I think that's largely why people do have insurance representatives on both sides, because those provisions are standard. They're across the board. It's not just the Burlington policy. It wouldn't be different if it was another insurance carrier's policy. When you're looking at commercial general liability policies, you're going to have generally a main commercial general liability coverage form and a number of endorsements that go with it, depending on what class, what rating. It reminds me of when I first got on the bench, one of my colleagues said people will be putting documents in front of you to sign, and you will ask, where do I get the authority to do this? And the answer will be, we've always done it this way. Just sign, right? So what you're telling me is we've always done it this way. And not necessarily that we've always done it this way, because I think actually the process has gotten cleaner, and there's more attempts that if you want to just short circuit what you're looking for. If you're a security guard company and you're worried about assault and battery, you see a contractual liability amendment, you don't need to read it. There was asbestos exclusion, I think, cited in the brief. I don't think they would read the asbestos exclusions. But if what you're of paramount concern is contractual liability, and there's an endorsement called contractual liability, and it's a one-page endorsement that in bold letters says contractual liability, that's the only page you need to read that would change the standard terms. And there's nothing confusing that's been pointed out in this language. It's in plain English. And it doesn't say, go find paragraph four. By the way, the last sentence is deleted. It tells you exactly what's deleted. It tells you we are taking out the sentence that says an employee. I understand your argument. What I don't understand is why put something in the contract on one page and then 16 pages later say we've deleted it. That's what I don't understand. I don't quite understand that way of operating. It doesn't make any sense to me other than the fact that it's confusing. Not being in the drafting expertise area, I think generally there is a main commercial general liability form. It's worked through through ISO, the insurance service offices. They go through the state of California and the other states, and they come up with the main forms. That's the main form that's generally used across the insurance industry with all different carriers depending on different types of insurers. I mean, the insurance company is entitled to figure out what risk it's insuring and weigh what risk it wants to insure. And so it's not just one packet that applies equally to all types of trades and all types of scenarios and all types of locations. So that's what's being done by way of the endorsement. So here you've got a labor contractor. Correct. I take it the insurance company knows what the business is. It must play some role in the underwriting. The insurance company definitely knew it was a foreign labor contractor because it's reflected on the policy. Now, whether or not there was underwriting documentation submitted to the insurance company suggesting that they have indemnity agreements, indemnifying others for their sole negligence, that's not an evidence, and I haven't seen that. And that's where there's a difference here. And frankly, the reasonable expectations we're talking about, if this same thing had happened the year before in a policy that they paid $84,000 more for, there wouldn't have been coverage either. And what I'm hearing now, which is different than the complaint in this lawsuit, the complaint in this lawsuit is almost entirely based on we had a policy with Admiral right before yours. If we didn't change to you, we're covered. That was the focus of the entire lawsuit. And then we showed them, no, you're not. There's an exclusion right here. You're clearly not covered. Then you went and got a policy for $84,000 less, and you're still not covered. And Judge O'Neill did a very thorough decision on each of the three exclusions that apply going through them. And so about the third exclusion, the automobile insurance, what about this argument made by Mr. Seder that there were concurrent causes? It wasn't actually solely the fact that he was he had a heat stroke while he was loading grapes. The charges of Vignolo failed to have adequate communication equipment to call medical aid to his help. Why isn't that a separate concurrent cause which is not excluded? I think the first reason to address that is the actual basis of that allegation is from the complaint. And the complaint, which is in excerpts of record, page 85, says, quote, the trucks supplied by Vignolo did not have appropriate communication equipment that could be used. And then it goes on. Now, this allegation that was in the complaint was about maintenance of the automobiles and trucks. And the phones on it, which fall under the same auto exclusion that you would expect it to fall under. Well, but the exclusion was for loading and unloading. It wasn't for the equipment of the truck. It was also for the auto as a whole as well. Loading and unloading is one subsection of the exclusion. And generally, maintenance of equipment on an auto is something that you're going to expect to have covered under the auto policy. Why? Communications equipment isn't standard in an auto. Well, and that's why the allegation, we're not even sure what the basis was as far as phones on the auto. There's no nitty-gritty, but the allegations in the complaint against Vignolo included an allegation the trucks didn't have proper equipment on it. The allegations that have been made here that, well, you know, there was just a failure of prompt response, failure of prompt equipment, those are based on ESPARZA's own additional statement of facts based on their own discovery responses. It's not actually based on allegations made in the underlying action against ESPARZA. These are their own. That's one of the things that Judge O'Neill admonished them for is relying on these new additional material facts, which weren't just argumentative. Looking at the truck part, I mean, presumably the truck's going to carry whatever needs to be carried, a first aid kit or so forth. But that doesn't make the first aid kit part of the truck. Well, no. In that case, that would actually be under a homeowner's policy or a runner's policy if it's... I'm talking about another kind of insurance. I mean, have you ever read your own homeowner's policy? You're not a fair sample because given your line of work, but I've got to tell you, I haven't. So, but as to this exclusion, I mean, the fact that the communications equipment or any other kind of equipment will be carried on the truck, does that really make it part of the truck so that it's not a claim that the truck itself was defective? It needed to be carried somehow, and the truck's going to be how it's going to carry it. But does that mean that it relates to the auto? I think if it's communication equipment on the truck, it is. And I think what you're describing in that scenario, it would not be. If we're talking about... Well, but the communications equipment, does a truck customarily come with the kind of communications equipment they're talking about? That's what's not been put into evidence as far as... No. I mean, there was the day where I'm a little older, the CB radios and so forth, but that wasn't standard equipment. I think they're really talking about equipment being carried out in the field where it might be needed. Well, and that's... I mean, the insured has a duty to at least get within the insuring clause of the policy before we even talk about this. So what is the actual bodily injury caused by an occurrence that relates to this other concurrent cause? The only thing you could actually come up with based on the complaint would be the communication equipment that would be on the truck and maintained on the truck, which is different than the broad principles that are being alleged now, which is there was just this general failure to take safety precautions, be able to act faster. And then there's a second issue with the concurrent proximate cause, and it's actually a really interesting legal theory that I've had to come across a lot lately, but are they really combining to cause the injuries? I mean, in Partridge, which is a case that probably will be unlike any other, that's the one that sort of started this whole concurrent proximate cause. It was someone who modified a gun to have a hairline trigger, a .357 Magnum, so it would be really easy to fire. While he was driving the car? While he's driving with his friends, hunting jackrabbits. And then he goes off-roading to hunt to try and get them, and while doing that, the hairline trigger goes off and hits a passenger. And so the same insurer happened to have an auto policy and a homeowner's policy, and they were saying, we cover it for the auto but not for the homeowner's policy because there's an exclusion for use of an auto. And the California Supreme Court looked at it and said, well, hold on here. There's really two causes. You're shooting at home, modifying a .357 Magnum. It's not going off unless you make it really easy to go off. And then you're off-roading, bumping around, trying to shoot jackrabbits. And so they found coverage under both. We're not dealing with that scenario here. We're not dealing with a failure of equipment to have caused the injuries. We're dealing with he was loading grapes onto a truck. That's what it arose out of, and that's clearly excluded under the policy. The failure of the equipment to cause the injury was your words. The failure of the existence of any communication equipment is alleged in the Vignola case as causing the injury. Right, the failure of the communication equipment. That's right. The existence of the communication equipment. The truck wasn't properly equipped. The truck supplied by Vignola did not have appropriate communications equipment that could be used to save lives in the event of an emergency. That's correct. Right. Why is that not covered under the auto coverage? Why is it excluded under the auto exclusion? Because we're talking about communication equipment of the truck. Exactly. And so what Judge Clinton pointed out would be that isn't just a – if the allegations that are being made in their own discovery responses that they rely on were the same as what was being alleged in the underlying action, then you have a broader principle. I still don't think you have concurrent causes, which is a separate issue. But if we're assuming for purposes of this that there's two causes and you need to figure out whether both are covered or not, well, then you might have a different scenario. But here you have one cause, and the cause was the loading. What do I find in the policy exclusion as to any injuries caused by lack of auto equipment? No. There isn't any. It doesn't say it that way. So the only thing it says is it's exclusion if the loading or unloading of an auto. Or arising out of an auto. There's other subsections, but yes. Could you give me a citation on that? Sure. It is on Excerpt from Record 305. Okay. Can I ask you one quick question about the significance of this? What was approved by the California Insurance Authorities? What document? For purposes of the policy? This policy. You indicated that the language and everything was submitted to the California Insurance Commission, whatever it's called. Yeah. I think my understanding is pretty much every endorsement has to be approved before it could be issued in the state of California. Now, I mean, there's no evidence that's come through this case as to whether that happened or not. But that is my understanding, which is you can't just be a private company and issue a policy and issue endorsements that aren't vetted. Your position is that the insurance does not apply to bodily injury or property damage arising out of any auto. An auto is a defined term. An auto includes communication equipment which should be on the auto. And as it goes on as well, Your Honor, where it says, this exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by insurance. But where does it say that there's an exclusion as to negligently caused lack of communication equipment or anything like that? It doesn't directly say that. So you're relying for the exclusion on what language? I'm relying on two and three. Arising out of an auto and loading and unloading. Well, actually, loading and unloading of auto, that was for the other part that we discussed. Arising out of an auto. Where is auto defined as a term in the policy? Excerpts of record 270, Your Honor. 270. Premium auto. Oh, definitely. Bottom right-hand corner. Means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment. So if the communication equipment were a walkie-talkie which was not attached to the auto. Mobile equipment is actually defined differently. It's not mobile in the sense of telecommunications. Mobile equipment would be like bulldozers, forklifts. You mean movable. Right. It's not mobile like. Like a mobile phone. Correct. So if it isn't attached machinery or equipment, it isn't part of the auto. Correct. And that's consistent. Does that help you? Yes. A walkie-talkie is not attached to an auto. I don't recall an allegation about it being a walkie-talkie. Well, communication equipment, broad enough to include a walkie-talkie, perhaps. All right. Thank you. What significance, assuming that the California Insurance Commission approved this endorsement, what legal significance would that be some sort of defense to you? No. I mean, I don't think there's any, honestly, any relevance at all with that. I think what's relevant is whether or not, you know, there's no real discussion about plain, clear, ambiguous, reasonable expectations. All of that is completely irrelevant as well. The only issue is whether this is conspicuous. That's the entire issue. And we're talking about an endorsement that's listed on the forms. It's got its own one page with a big, dark font, large, bold heading that says Contractual Liability Amendment. The other cases that have been cited for inconspicuousness are dealing with completely different scenarios. They're never on separate pages. I realize I've gone over my time, so unless anyone has any questions, respectfully submit. Thank you. Thank you. Mr. Sheeter, we'll give you two minutes. But unless you're answering a question from one of us, I'll channel Chief Justice Rehnquist, who would stop people in mid-sentence. Thank you, Your Honor. Mr. Sheeter, do you argue in any place in your brief that the allegation of lack of communication equipment invokes the auto coverage as a concurrent cause and that the communication equipment can be a smartphone, which is not attached to the vehicle? We do make that argument, and we do. Where? Page 43 of our opening brief. Okay. Thank you. I'm sorry I took up so much of your time. Go ahead. Okay. And that section. But then I'd also like to point out, you know, with regard to this discussion about the concurrent proximate cause and the communications equipment, the duty to defend requires the insurer to eliminate any possibility of coverage. So if there's any way of construing the allegation in the Vignolo complaint as including a walkie-talkie or something not excluded or within the exclusion, then they have a duty to defend. The other point I wanted to raise was during the discussion, there was — Of a duty to defend and a duty to indemnify, two separate obligations. So what would be the damages simply from a duty to defend as opposed to there was a defense? They didn't provide a defense. So they denied coverage without defending. But somebody defended, or am I just totally confused? Esparza was defended in the underlying action. The insurance company did not provide that defense. So the measure of damages would be simply the cost of the defense. It wouldn't be the $750,000 judgment. Because they denied coverage without providing the duty to defend, if that coverage was wrongfully denied, then they're required for the cost of handling the action as if that defense would have been provided. If there's one point you wanted to make, I'll let you make it. Okay. Thank you, Your Honor. Just in terms of the underlying action, the fact that Herrera was not named as a defendant by the plaintiffs in the underlying action, was only named in the cross-complaint, does not exclude the possibility that there could have been an allocation of negligence to Herrera in that action. And that was Burlington's duty to point out in order to show that the agreement in the farm agreement between Vignolo and Esparza was for Vignolo's sole negligence. Meaning Burlington was required to prove that the indemnity agreement between Esparza and Vignolo was for Vignolo's sole negligence. And with that, I'll conclude. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Korman, Clifton, Bea